LILLIE, J.
 

 The state, through the Department of Public Works, sued the city of Los Angeles, Van M. Griffith, and others to condemn their interests in certain lands known as Griffith Park for the construction of a state highway. After a trial without a jury, judgment was entered condemning the land to plaintiff, awarding the city the sum of $3,750,000 and denying defendant Griffith compensation. He alone appeals from the judgment.
 
 *563
 
 The within litigation arose out of the state’s condemnation of approximately 200 acres of land within Griffith Park maintained by the city of Los Angeles for the construction of the Golden State Freeway; and had its genesis in a deed dated January 5, 1897 (Ex. F) executed by G. J. Griffith, defendant’s father, conveying to the city without condition or restriction certain lands which, by city ordinance, were dedicated as a public park and today constitute the major portion of Griffith Park.
 

 On March 5, 1898, Griffith executed another deed (Ex. G) reciting a conveyance to the city of lands which include those already conveyed by the deed of 1897 (Ex. F). The conveyance was “upon condition” that the lands be used exclusively as a public park, and “upon further condition” that the name Griffith be retained by the city; and whenever any part of the land shall cease to be used as a park and if the name ever be changed by the city, it shall immediately, upon the happening of either event, revert to the grantors or their heirs.
 

 In March of 1954, the State of California notified the Los Angeles Board of Recreation and Park Commissioners of its intention to appropriate a portion of Griffith Park lands for a state highway, which the board protested, submitting alternate routes outside the park; however, on March 13, 1955, the State Highway Commission passed a resolution (Ex. 10) declaring that the public interests and necessity require the acquisition of these lands for state freeway purposes; and pursuant thereto, the state commenced the within action on April 27, 1955. Orders of immediate possession were issued; the state took physical possession; and before the trial the Golden State Freeway was completed, utilizing approximately 200 acres of park property, which the board replaced with other purchased lands. Defendant Griffith’s answer to the complaint alleged, among other things, the taking to be contrary to the terms of the grant and city charter; but asserted no reversionary right and sought no damages for its taking.
 

 Appellant’s assignments of error are lengthy, consisting of 22 separate points, only some of which are supported by argument, citation of authority, or reference to the record (Rules on Appeal, rule 15(a)). We ascertain, however, that his primary attack lies against various findings and procedural errors of the trial court; and that his main complaint goes to the right of the state to acquire park property for
 
 *564
 
 state highway purposes, and his right as the reversionary heir to compensation for the taking.
 

 Appellant first contends that the state cannot acquire property already dedicated by a municipality as a park. A review of the statutory authority relating to the right of eminent domain for state highway purposes and the instruments controlling the grant convinces us that the taking was proper.
 

 Although section 1240, Code of Civil Procedure, permits the state under its general authority to condemn through the Department of Public Works for state highway purposes any land which it is authorized to acquire (Sts. & Hy. Code, § 102), to take “property appropriated to public use . . . for a more necessary public use than that to which it has already been appropriated” (subd. 3), a separate statute specifically authorizes the taking of park lands. Section 103.5, Streets and Highways Code, provides that the Department of Public Works may acquire any property dedicated to park purposes, however it may have been dedicated, when the State Highway Commission has determined by resolution that “such property is necessary for state highway purposes.” Reading the three statutes together, it is clear that lands heretofore dedicated as a public park, are as well included in the general section authorizing the state to acquire property already appropriated to a public use if the acquisition be for “a more necessary public use” (Code Civ. Proc., § 1240, subd. 3), as in the special statute which authorizes a state to take park property when the commission determines it is necessary for state highway purposes. The latter statute, specific in its reference to lands already dedicated to park purposes, controls the former general provision even though it, “standing alone, would be broad enough to include the subject to which the more particular provision relates.”
 
 (Rose
 
 v.
 
 State,
 
 19 Oal.2d 713, 724 [123 P.2d 505].)
 

 In that connection, for the moment disregarding the controlling section (103.5), the state did properly acquire the land for “a more necessary public use” under section 1240, subdivision 3, Code of Civil Procedure. Inasmuch as the taking for highways has from time immemorial been universally recognized as one for public use
 
 (Rindge Co.
 
 v.
 
 County of Los Angeles,
 
 262 U.S. 700 [43 S.Ct. 689, 67 L.Ed. 1186];
 
 People
 
 v.
 
 Olsen,
 
 109 Cal.App. 523 [293 P. 645];
 
 County of San Mateo
 
 v.
 
 Coburn,
 
 130 Cal. 631 [63 P. 78, 621]), streets and highways are of great public concern
 
 (Sherman
 
 v.
 
 Buick,
 
 
 *565
 
 32 Cal. 241 [91 Am.Dec. 577]), the control, construction and maintenance of which are governmental functions
 
 (Bettencourt
 
 v.
 
 State,
 
 123 Cal.App.2d 60 [266 P.2d 201, 43 A.L.R.2d 545]); and the establishment of a statewide system of freeways and connections thereto is "essential to the future development of the State of California” (Sts. & Hy. Code, § 250 et seq., as amended in 1959); it cannot be said as a matter of law that a state freeway is not a “more necessary public use” than a city park—particularly when, as here, the freeway also constitutes a federal defense highway (Ex. 13), of concern to city, county, state and nation, primary to a park dedicated and maintained for the use of city residents.
 

 Appellant argues that under subdivision 2, section 1240, Code of Civil Procedure, “land belonging to any incorporated city which has been appropriated to some public use may not be taken under the eminent domain provision” (A.O.B., p. 5). Section 1240 does not relate to what property “may not be taken,” but specifically declares what “may be taken under this title (Title VII)”
 
 (County of Marin
 
 v.
 
 Superior Court,
 
 53 Cal.2d 633 [2 Cal.Itptr. 758, 249 P.2d 526]), which includes, under subdivision 2, lands belonging “to any county, incorporated City . . . not appropriated to some public use ...” The converse interpretation urged by appellant and his reliance on dicta in
 
 Marin County Water Co.
 
 v.
 
 County of Marin,
 
 145 Cal. 586 [79 P. 282], are unwarranted inasmuch as subdivision 2 is silent concerning lands owned by an incorporated city and appropriated to a public use, subdivision 3, immediately following, specifically includes property already appropriated to public use, and
 
 Marin County Water Co.
 
 v.
 
 County of Marin, supra,
 
 145 Cal. 586, is not here applicable.
 

 Citing section 13, article XI, California Constitution prohibiting the Legislature from delegating to “any special commission . . . any power to make, control, appropriate, supervise or in any way interfere with any county, city, town or municipal improvement, money, property or effects . . . or perform any municipal functions whatever,” appellant argues the unconstitutionality of section 103.5, in that the State Highway Commission, “a special commission,” has no authority, by resolution or otherwise, to determine that city park property is necessary for state highway purposes. The obvious purpose of this provision was to “prevent the state Legislature from interfering with local governments by the appointment of its own special commissions for the
 
 *566
 
 control of purely local matters”
 
 (In re Pfahler,
 
 150 Cal. 71, 87 [88 P. 270, 11 Ann. Cas. 911, 11 L.R.A.N.S. 1092]) and
 
 “to
 
 emancipate municipal governments from the authority and control formerly exercised over them by the Legislature.”
 
 (People
 
 v.
 
 Hoge,
 
 55 Cal. 612, 618.) Sections 100.1, 100.2, and 100.3, Streets and Highways Code, authorize the State Highway Commission to designate, construct and maintain freeways on “such terms and conditions as in its opinion will best subserve the public interest,” and “to do anything else necessary to the maintenance of a state highway system”
 
 (Holloway
 
 v.
 
 Purcell,
 
 35 Cal.2d 220, 231 [217 P.2d 665]); and it may, in accord with the needs of public interest, condemn municipal property. The power to establish and maintain a state highway system by the designation of freeways under the “policy of freeway construction in the public interest” adopted by the state Legislature, has been properly and validly delegated by it to the State Highway Commission
 
 (Holloway
 
 v.
 
 Purcell, supra,
 
 35 Cal.2d 220, 231-232); and the purpose for which it was formed takes it out of that category of “special commissions” mentioned in the constitutional prohibition. The commission fulfills a statewide purpose, not a local one; and its authority and functions are not
 
 per se
 
 an interference with municipal affairs even though, in properly exercising the state’s inherent power of eminent domain the maintenance of a civic improvement or a municipal function may be impaired.
 

 Appellant complains that the taking violates the city charter providing that all lands dedicated as a public park shall forever remain to the use of the public inviolate (§ 170(b) (3)); and that the latter “being a Legislative act” having been approved by the Legislature subsequent to the enactment of section 103.5
 
 (In re Means,
 
 31 Cal.App.2d 290 [87 P.2d 894]), controls under the rule of construction of two conflicting legislative acts. A similar issue was raised in
 
 Wilkes
 
 v.
 
 Gity & County of San Francisco,
 
 44 Cal.App.2d 393 [112 P.2d 759], in a personal injury action arising out of negligence in the maintenance of a highway, in which plaintiff filed her claim under the provisions of a city charter which she claimed prevailed over the State Public Liabilities Act. Said the court in holding against her: “The approval of a municipal charter by the state Legislature confers the power of home rule upon the municipality, but this power is limited to municipal affairs. In non-municipal matters the general rule controls.” (P. 395.) “It is universally recognized that
 
 *567
 
 the state in its sovereign capacity has the original right to control all public streets and highways”
 
 (Western Union Tel. Co.
 
 v.
 
 Hopkins,
 
 160 Cal. 106, 118 [116 P. 557]); the designations and construction of the state highway system are “of more than local concern”
 
 (Young
 
 v.
 
 Superior Court,
 
 216 Cal. 512, 517 [15 P.2d 163]), are matters of statewide concern (Cal. Const., Art. IX, § 36;
 
 Sherman
 
 v.
 
 Buick,
 
 32 Cal. 241 [91 Am.Dec. 577]); and it is essential “to the future development of the State of California to establish and construct a statewide system of freeways” (Sts. & Hy. Code, § 250). Section 103.5, specifically authorizing the exercise of the power of eminent domain over park lands for state highway purposes, clearly “relates to a matter of statewide concern,” which controls over the city charter; “and does so without regard to whether its enactment preceded or followed the charter provision”
 
 {Wilkes
 
 v.
 
 City & County of San Francisco, supra,
 
 395), even though the taking affects a municipal function “in the accomplishment of a proper objective of statewide concern.”
 
 {Department of Water & Power
 
 v.
 
 Inyo Chemical Co.,
 
 16 Cal.2d 744, 754 [108 P.2d 410].)
 

 Related closely to this issue is appellant’s claim that the trial court erred in denying leave to file a cross-complaint, and excluding evidence on the issue of bad faith and abuse of discretion.
 

 Three years and five months after filing his answer, appellant moved for leave to file a cross-complaint against plaintiff and the city, alleging a reversionary right and damages for its taking, the state’s violation of the charter, and state and federal constitution, the unconstitutionality of section 103.5, the abuse of discretion and arbitrary acts of the Department of Public Works, the availability of better alternative routes, a conspiracy of the city and state to divert park lands, and the city’s lack of good faith in defending against the state’s taking. The motion was denied. All of these matters with the exception of those relating to abuse of discretion, availability of alternate routes, conspiracy and bad faith, were covered by issues raised by the answer, heard and considered by the trial judge and are now before this court; it is only those excepted we propose to here discuss.
 

 A defendant has the right to file a cross-complaint at the time of filing his answer (Code Civ. Proc., § 442), but thereafter leave to file such a pleading becomes a matter of discretion for the trial court
 
 {Nels E. Nelson, Inc.
 
 v.
 
 Tarman,
 
 163 Cal.App.2d 714 [329 P.2d 953]). In addition to
 
 *568
 
 the questions of law involved, it no doubt considered the delay, the pretrial proceedings, the explanation for the delay, and information disclosing that the facts relied upon by defendant existed as well on August 17, 1956, when the answer was filed; and in reviewing the same we find neither abuse of discretion nor error of law in the denial.
 

 Relative to whether a finding of necessity of a condemning body is reviewable when facts establishing fraud, bad faith, abuse of discretion or conspiracy are affirmatively pleaded, it is now settled that recitation of “public necessity” in a resolution is conclusive evidence thereof, and “questions of the necessity for making a given public improvement, the necessity for adopting a particular plan therefor, or the necessity for taking particular property, rather than other property, for the purpose of accomplishing such public improvement, cannot be made justiciable issues even though fraud, bad faith, or abuse of discretion may be alleged in connection with the condemning body’s determination of such necessity”
 
 (People
 
 v.
 
 Chevalier,
 
 52 Cal.2d 299, p. 307 [340 P.2d 598]). In the Chevalier case the court upheld the lower court’s ruling striking the “special defenses” relating to the issue of “necessity,” which included fraud, bad faith, abuse of discretion and conspiracy between the city and state; and disapproved any language to the contrary in various eases, specifying among them
 
 People
 
 v.
 
 Milton,
 
 35 Cal.App.2d 549 [96 P.2d 159], relied upon by appellant.
 

 Inasmuch as the determination of necessity for the taking for highway purposes is, under the circumstances alleged in appellant’s cross-complaint, conclusive under section 103.5, and bad faith and abuse of discretion, conspiracy and bad motive of the condemning body are not justiciable issues, neither was it error for the trial court to exclude evidence on these matters.
 
 People
 
 v.
 
 Chevalier, supra,
 
 is also controlling on the inadmissibility of evidence of alternate routes and we find on the issue of “necessity” no error in excluding the same or evidence of cost of acquisition of other land to substitute for the park land taken.
 

 Appellant also assigns as error the trial court’s denial of his objections to the pretrial conference. Aside from the bare statement of this assignment, he has failed to assume the burden of proving wherein the error lies, offering neither argument nor authority. Before dismissing the point it should be noted that the record is silent that the objections were urged, argued or even considered on their merits. Indeed there
 
 *569
 
 is nothing to show their denial by minute order or otherwise, other than that the conference was held, from which it would be reasonable to infer either that the objections were never urged or if they were that the court made no determination thereof.
 

 Although appellant urges “ (T)he taking of Riverside Drive within Griffith Park” to be error, he does not show the materiality of the status of the Drive—as a state highway or as a park roadway. Even assuming that it was still park land, the state, under the authority hereinabove set forth, had as much right to take the same as any other portion of the park. If his contention goes to the amount of compensation, the record shows that the value of the easements acquired by the state was the subject of a stipulation between the city and the state, no evidence thereof was offered by appellant and, in any event, as hereinafter developed, the construction of the grant and the law covering the same do not admit any interest of appellant in the land, in reversion or in the award.
 

 The last general issue raised by the remaining assignments of error attacking certain trial court findings that there was no reversion of the lands to appellant and he is not entitled to any part of the award, relates to the construction of the instruments of the grant. He says, in support of his reversionary right to the land in fee that the 1896 city ordinance accepting and dedicating the 3,000 acres as a park and the 1897 deed conveying the same to the city were merged into the deed of 1898, which conveyed a determinable base fee and controls the entire grant; and argues that the construction of the state highway in the park, and the city’s execution of the “Freeway Agreement,” its abandonment of certain pleaded defenses in its answer and its acquiescence in the diversion of the property, caused reversion of the land to him. We find no merit to either position.
 

 On December 16, 1896, the city by ordinance accepted and dedicated, as a public park, 3,000 acres of land given by Griffith “without condition or restriction.” A deed dated January 5, 1897, executed by him conveyed these lands to the city in fee simple without condition. There is nothing in the record before us to indicate that this deed was not duly executed or for any reason did not constitute a conveyance. The state of the evidence leaves us with only one conclusion— that the 1897 deed conveying the 3,000 acres described therein, was the “final and exclusive memorial of the intention and rights of the parties.”
 
 (Wing
 
 v.
 
 Forest Lawn Cemetery Assn.,
 
 
 *570
 
 15 Cal.2d 472, 479 [101 P.2d 1099, 130 A.L.R. 120].) Thus, upon its execution Griffith (the grantor) completely and forever divested himself of any legal right, interest or title in the land covered by the deed; and no act done subsequent to the execution and delivery of the deed can affect its integrity.
 
 (Lavely
 
 v.
 
 Nonemaker,
 
 212 Cal. 380, 383 [298 P. 976].) The next year, on May 5, 1898, Griffith executed another deed conveying to the city 3,015.788 acres of land, including, but not limited to, the lands previously conveyed without condition or restriction by the 1897 deed. The 1898 deed, although covering the same lands, in no way legally affected the prior instrument or the status of the land conveyed thereunder and could and did convey to the city only those lands described therein which were not included in the earlier deed. The deed of 1897 conveying the land in fee simple without condition or restriction controls that grant and appellant thereunder has no right, title or interest to those lands reversionary or otherwise. The cases relied upon by appellant do not support his claim that the 1898 instrument “merged all previous agreements, superseding the 1897 deed,” for they do not deal as here with the effect of a subsequent deed on an earlier one, but with the effect of a subsequent deed on a previous contract to purchase pursuant to which the deed was given.
 

 Turning now to the construction of the 1898 deed to determine the status of that limited acreage not included in the earlier 1897 conveyance, the language employed therein entirely disclaims a determinable fee which, when terminated, caused an automatic reverter; but on the contrary, makes it clear that the city became the owner thereof in fee simple subject to a condition subsequent, the breach of which requires reentry to terminate the estate. The 1898 instrument provides that the lands are “ (T)o be used as a public park. . . . And this gift and grant is made, and said property is hereby conveyed . . . upon the further condition that the name of said park now established by ordinance of said city, to wit, ‘Griffith Park’ be continued as the official name and designation of said park, and whenever said tract of land hereby conveyed, or any part thereof shall cease to be used as a park . . . and if said city . . . shall at any time change the official name of said park . . . then the lands hereby conveyed shall immediately upon the happening of either of said events, revert to said parties of the first part or their heirs” (Ex. G).
 

 The words “upon condition” are common to, and manifest the intent to create an estate in fee simple subject
 
 *571
 
 to a condition subsequent (Rest., Property, § 45, p. 140), the effect of which is to convey the entire estate; but upon the occurrence of the condition imposed, to give the holder of the reversionary interest the right to reenter and declare the termination of the estate—if no reentry is made the estate continues. A similar description is found in a deed conveying lands to the city of Long Beach “upon the condition” they be used exclusively as and for a public park and “upon the further condition” that no buildings or structures be erected on the premises that would obstruct the view of the Pacific Ocean from lots north of and opposite the property
 
 (Taylor
 
 v.
 
 Continental Southern Corp.,
 
 131 Cal.App.2d 267 [280 P.2d 514]). Holding the instrument to be a conveyance upon a condition subsequent, the court stated at page 274: . . the mere possibility of forfeiture of title for breach of condition subsequent could not affect that vested interest, not unless or until the owner of the reversionary right has invoked the condition by reentering or suing in some form for declaration of termination of the grantee’s title”; and relative to the right of reentry: “. . . when the grantor conveys the fee simple on condition subsequent, he has no actual
 
 estate
 
 remaining with him. The grantee takes the entire estate of the grantor, and unless he breaches the condition is in the same position as an owner in fee simple absolute. The interest of the grantor in such ease is not, strictly speaking, a residue of the estate left in him; it is merely a right or power to terminate the estate of the grantee and retake the same, if there is a breach of condition (Citations).” (P. 275.) A deed providing that the conveyance is made for railroad purposes only, and “if not so used, then it is to revert to the parties of the first part” was construed as creating a condition subsequent
 
 (Behlow
 
 v.
 
 Southern Pac. R.R. Co.,
 
 130 Cal. 16 [62 P. 295]); likewise one conveying land for use as a dam and reservoir providing “that in ease” the grantee “shall cease to use the said premises for the said purposes . . . then and in that ease” they “shall revert to and become the property of” the grantor.
 
 {Johnston
 
 v.
 
 City of Los Angeles,
 
 176 Cal. 479 [168 P. 1047].) In
 
 City of Santa Monica
 
 v.
 
 Jones,
 
 104 Cal.App.2d 463 [232 P.2d 55], several deeds conveyed a fee simple title to land “upon the condition . . . that the property conveyed should ‘revert’ to the grantors,” upon several contingencies. Holding the conveyance to be a fee simple subject to a condition subsequent, the court at page 473 said: “. . . the breach is not regarded as a breach until the grantor or his heirs elect to
 
 *572
 
 give it the requisite vitality by declaring a forfeiture based thereon by the process of reentry or its legal equivalent.”
 

 So, too, the rule of strict construction applicable to a condition subsequent provision
 
 (Behlow
 
 v.
 
 Southern Pac. R.R. Co.,
 
 130 Cal. 16, 19 [62 P. 295]) requires the court to avoid forfeiture in a deed whenever possible
 
 (Mitchell
 
 v.
 
 Cheney Slough Irrigation Co.,
 
 57 Cal.App.2d 138 [134 P.2d
 
 34]; Wedim-Alclahl Co.
 
 v.
 
 Miller,
 
 18 Cal.App.2d 745 [64 P.2d 762];
 
 Hasman
 
 v.
 
 Elk Grove Union High School,
 
 76 Cal.App. 629 [245 P. 464]
 
 ;
 
 Civ. Code, § 1442) and an interpretation requiring reentry before forfeiture over an interpretation creating a determinable fee providing for automatic forfeiture. Similarly applicable, under the instant circumstances, is the rule of construction that
 
 “a
 
 grant is to be interpreted in favor of the grantee” (Civ. Code, § 1069;
 
 Hasman
 
 v.
 
 Elk Grove Union High School,
 
 76 Cal.App. 629 [245 P. 464];
 
 Ball
 
 v.
 
 Mann,
 
 88 Cal.App.2d 695 [199 P.2d 706];
 
 Anderson
 
 v.
 
 Broadwell,
 
 119 Cal.App. 130 [6 P.2d 260];
 
 Cooper
 
 v.
 
 Selig,
 
 48 Cal.App. 228 [191 P. 983]). Even assuming, as urged by appellant, that there was a breach of the condition subsequent by the city we find nothing in the evidence to justify any finding that a forfeiture of the estate was declared by the process of “reentry or its legal equivalent. ’ ’
 

 The trial court found that no acts of the state were in violation of the conditions of the grant, and the condemnation did not cause a reversion of all or any part of the fee to appellant. In so finding it no doubt also considered the following provision in the 1898 deed: “It is understood that the use of any part of said premises for . . . transportation purposes, for carrying the inhabitants of said City into and through said park, shall not be considered a violation of any of the conditions upon which this donation and grant are made, anything to the contrary thereto notwithstanding.” (Ex. G.) Although it is true that the taking was for a state use and that the same ultimately became a part of a statewide freeway project, it cannot be denied that the highway in question has made Griffith Park more readily accessible to all residents of the city; and as a freeway which can be, and is, employed for carrying the inhabitants of the city “into and through said park” the use appears to be one excepted under the deed.
 

 However, proceeding to an interpretation of the condition subsequent, we note that the State of California
 
 *573
 
 was at no time ever a party to any of the instruments. No deed provision, especially between two strangers, could legally curtail or prohibit the otherwise lawful exercise of the state's power of eminent domain. Any interpretation of the condition subsequent sought by appellant would not only limit and seriously impair the state’s power which, although not arising out of specific grant in the Constitution, is inherent in the state and founded upon the law of necessity
 
 (Rose
 
 v.
 
 Superior Court,
 
 19 Cal.2d 713 [123 P.2d 505]); but would be contrary to section 103.5, expressly providing for the state’s acquisition of property dedicated to park purposes; and would be precluded under section 1441, Civil Code, which provides that a condition in a contract, the fulfillment of which is unlawful, is void, and cannot affect the grant under the deed
 
 (Wills
 
 v.
 
 Los Angeles,
 
 209 Cal. 448, 451 [287 P. 962, 69 A.L.R. 1044]). Similarly the city of Los Angeles is “not responsible for the exercise” by the state of its power of eminent domain and has no control over the same, and the provision in the deed between the city and a third party, if construed to affect a prohibition of that power, would be wholly ineffective
 
 (City of San Gabriel
 
 v.
 
 Pacific Elec. Ry. Co.,
 
 129 Cal.App. 460, 466 [18 P.2d 996]). “All property is, and must be, held subject to the right of the State to take and use it for public purposes; this includes property devoted to a public use ...”
 
 (Town of Winchester
 
 v.
 
 Cox,
 
 129 Conn. 106 [26 A.2d 592, 596]).
 

 The universally recognized rule that the power of eminent domain is paramount to the right secured by the obligation of contract clause, and its exercise in no way interferes with the inviolability of contracts
 
 (Pennsylvania Hospital
 
 v.
 
 Philadelphia,
 
 245 U.S. 20 [38 S.Ct. 35, 62 L.Ed. 124];
 
 Cincinnati
 
 v.
 
 Louisville & N. R. Co.,
 
 223 U.S. 390 [32 S.Ct. 267, 56 L.Ed. 481]; 12 Am.Jur. 22, § 394), precludes any holding that the resolutions of the commission are unconstitutional is impairing the obligations of the contract between the donors of Griffith Park and the city of Los Angeles. The constitutional inhibition of any state law impairing the obligation of contracts is not a limit on any statute authorizing the state or any department thereof to exercise the power of eminent domain.
 

 On the point raised by appellant that the city, having permitted “the street to be closed” and consented to the taking by executing an agreement with the state, abandoned the use of the lands for park purposes, which there
 
 *574
 
 upon immediately reverted to him—the record is silent relative to any streets within Griffith Park which were agreed to be closed. However, the city did execute a freeway agreement with the state, but it expressly provided that “ (T)he city’s execution of this agreement in no way implies that the city consents to, or approves of, the State’s acquisition of any city-owned lands for freeway purposes. ...” (Par. 7.) We know of no requirement that the city refuse to cooperate with the state once it has been established to the city’s satisfaction that the state has the power to condemn—indeed, an arbitrary refusal to do so might prove to be unjustifiably costly to the taxpayers. Such cooperation is, in fact, not only contemplated by, but expressly authorized under, section 100.2, Streets and Highways Code.
 

 To his claim that the city abandoned the defenses set forth in its answer—that the transfer of land from park use will violate certain charter provisions—appellant has failed to offer any argument or authorities.
 

 We hold that appellant has no interest of any kind in the fee estate which might justify his participation in the award; thus, the only right he could claim as reversionary heir would be that arising out of a showing that the limited lands conveyed under the 1898 deed would, within a reasonable time had there been no condemnation, have vested in him for the city’s violation of the condition subsequent
 
 (City of Santa Monica
 
 v.
 
 Jones,
 
 104 Cal.App.2d 463 [232 P.2d 55]). Although it is true that when a reversionary interest is condemned the reversioner must be compensated, it appears from the record that appellant’s only claim was for the value of the entire fee; he sought no reversionary right or compensation therefor. Further, any reversionary interest terminated upon the state’s taking and was then so remote, speculative and contingent as to justify no consideration by the court, and even had it a value capable of estimate, appellant offered no proof thereof.
 

 It is well settled that the valuation in an eminent domain proceeding is based solely upon market value
 
 (People
 
 v.
 
 Vinson,
 
 99 Cal.App.2d 100 [221 P.2d 161];
 
 People
 
 v.
 
 Ricciardi,
 
 23 Cal.2d 390 [144 P.2d 799]) ; therefore, unless the claimed reversionary right has some pecuniary value, no compensation is allowed for its taking. If “at the time fixed for the valuation the reversion has not occurred, the reversionary interest is said not to have any compensable
 
 *575
 
 value in a condemnation proceeding.”
 
 (Romero
 
 v.
 
 Department of Public Works,
 
 17 Cal.2d 189, 195 [109 P.2d 662].) So, too, “(I)t is well settled that upon condemnation of property held by a grantee under a deed containing a condition subsequent providing for a reverter to the grantor or his heirs upon termination of the use provided in the condition, the rights of reverter of the grantor and his heirs are terminated and the award for the property belongs to the grantee (Citations)”
 
 (City of Santa Monica
 
 v.
 
 Jones,
 
 104 Cal.App.2d 463, at p. 475 [232 P.2d 55], quoting from
 
 Carter
 
 v.
 
 New York Central Railroad Co.,
 
 73 N.Y.2d 610). And in discussing a situation similar to the one at bar, the court stated at page 472: “To us it seems altogether probable that appellants filed their answer upon the assumption that as the property taken by the city could not in the future be used for railway purposes by the company, for that reason alone it would revert and hence that appellants were entitled to the award. Any such view is directly contrary to well-established principles of law. ’ ’
 

 Any reversionary right appellant may have had under the 1898 deed was extinguished at the time the state condemned the interest of the city, for the seizure was of the entire title by the single act of appropriation. At that moment there had been no disuse and the estate being enjoyed by the city might otherwise have continued forever. The right of appellant was remote, speculative and a mere possibility of no value capable of estimate.
 
 (City of San Gabriel
 
 v.
 
 Pacific Electric Ry. Co.,
 
 129 Cal.App. 460 [18 P.2d 996].) Of interest is
 
 First Reformed Dutch Church
 
 v.
 
 Croswell,
 
 210 App.Div. 294 [206 N.Y.Supp. 132], cited in
 
 City of Santa Monica
 
 v.
 
 Jones,
 
 104 Cal.App.2d 463 [232 P.2d 55], in which the court held, even under a deed containing a limitation, that the seizure was of the entire title and at the moment of appropriation there had been no disuser, as a result of which the rights of the heirs in reversion were a mere possibility, possessed of no value capable of estimate.
 

 The record is silent relative to the value of appellant’s reversionary right—indeed, under the cases just cited it would appear that valuation would be very nearly impossible to estimate. Appellant not only made no claim to a reversionary right, separate and apart from that of the land in fee and sought no award for its taking, but he offered no proof thereon. The court did not err in finding that all that was of value
 
 *576
 
 was the estate of the city for which it was entitled to compensation, and that appellant was entitled to no part thereof. The judgment is affirmed.
 

 Wood, P. J., and Fourt, J., concurred.
 

 Appellant’s petition for a hearing by the Supreme Court was denied June 2, 1960.